STATE OF VERMONT

ENVIRONMENTAL COURT

|   |   |   |
|---|---|---|
| | } | |
| In re: R.L. Vallee, Inc. PUD (Preliminary Plat) | } | Docket No. 100-5-07 Vtec |
| In re: R.L. Vallee, Inc. PUD (Final Plat) | } | Docket No. 101-5-08 Vtec |
|   (Appeals of Timberlake Associates, LLP) | } | |
| | } | |

Decision and Order

Appellant Timberlake Associates, LLP, appealed from two decisions of the Development Review Board (DRB) of the City of South Burlington, approving a preliminary plat application and a final plat application by Appellee-Applicant R.L. Vallee, Inc. for a Planned Unit Development (PUD) at Spillane's Service Center at 811 Williston Road. Appellant is represented by David L. Grayck, Esq.; and Appellee-Applicant (Applicant) is represented by Thomas G. Walsh, Esq. The City is represented by William E. Flender, Esq., but did not take an active role or file memoranda in the appeals.

In Docket No. 100-5-07 Vtec, Appellant appealed the DRB decision granting preliminary plat approval to Applicant, and filed a statement of questions containing twenty-one questions. These questions did not refer to any specifically-numbered sections of the zoning ordinance. After the Court's August 17, 2007 decision and order on cross-motions for partial summary judgment, the parties agreed to await the DRB's decision on the final plat approval, allowing any new appeal of the final plat approval to be consolidated with the appeal of the preliminary plat approval. The Court ruled on an additional cross-motion for partial summary judgment as to Question 21 in Docket No. 100-5-07 Vtec on February 7, 2008.

In Docket No. 101-5-08 Vtec, Appellant appealed the DRB decision granting final plat approval, and filed a Statement of Questions containing twenty questions. These

1

questions did refer to specifically-numbered sections of the zoning ordinance.

The appeals were consolidated, and Appellant filed a Consolidated Statement of Questions combining the questions from both appeals that remained after the various motion rulings. All references to the project and the project plans are to the latest version of those plans proposed in the final application, reflected in Docket No. 101-5-08 Vtec and the revised project plans presented in evidence.

The Court resolved what are now Consolidated Questions 1 and 2 in its Decision and Order on Cross-Motions for Partial Summary Judgment in Docket No. 100-5-07 Vtec (August 17, 2007). The Court resolved Consolidated Question 23 in its Decision and Order on Pending Motions in both cases (October 3, 2008).

An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge, who took a site visit alone, by agreement of the parties, at the close of the final day of trial. The parties were given the opportunity to submit written memoranda and requests for findings, and extended the time for these filings by agreement. Upon consideration of the evidence as illustrated by the site visit, and of the written memoranda and requests for findings filed by the parties, the Court finds and concludes as follows.

Applicant owns a 0.47-acre (20,330 square foot) property with an existing building housing a service station and convenience store at 811 Williston Road, in the Commercial 1 zoning district and the Traffic Overlay 1 zoning district. City of South Burlington Land Development Regulations (Regulations) §§ 5.01 and 10.02.[1] The minimum lot size for this type of use in this district is 40,000 square feet, making the project property an existing undersized lot. Regulations, Appendix C, Table C-2

---

[1] All references to section numbers in this decision refer to sections of the City of South Burlington Land Development Regulations unless otherwise noted.

"Dimensional Standards by Zoning District" (Table C-2). The service station and gasoline dispensing use on the property is an existing nonconforming use that Applicant is entitled to continue on the property.

The existing project property is essentially flat, with a low area near the opening in a guardrail at its easterly side boundary, and gradual drainage towards its easterly and westerly sides. De facto access also exists through its easterly side lot line to the so-called Staples Plaza.[2] The existing building coverage is 19.15%, which complies with the 40% requirement found in Table C-2. The existing site coverage, including all impervious areas, is 92%. The existing building is set back 78.9 feet from the edge of the planned right-of-way, 29.6 feet from the nearest (easterly) side property line, and 5.9 feet from the rear (southerly) property line. The existing front setback complies with the minimum setback requirement of 50 feet from the edge of the planned right-of-way. § 3.06(B)(1). The existing side setbacks both comply with the minimum side setback requirement of 10 feet. Table C-2. The existing rear setback does not comply with the minimum setback requirement of 30 feet. Table C-2.

Section 3.06(H) provides that no more than 30% of the minimum required front setback area may be used for driveways and parking. The existing coverage of the front setback area is 90.5%.

Appellant owns an L-shaped parcel of property with an existing service station and convenience store at 801 Williston Road. Appellant's property adjoins the southerly and westerly boundaries of Applicant's property. Monitoring wells on Applicant's property are in place to track improvements in the levels of "perc[3]" contamination in groundwater due to a drycleaning use formerly on Applicant's

---

[2] This decision makes no findings regarding any rights to use such access. The evidence reflected that such access may be made a condition of future applications for the Staples Plaza site, but that it is not now required by any permit.

[3] An abbreviation for the chemical perchloroethylene (PCE) or tetrachloroethylene (TCE), a solvent used in drycleaning.

property. Water purged from these wells during monitoring is stored in drums on Applicant's property and is stored and handled as a hazardous waste, until it is removed from the property. The proposed site plan includes a dumpster and dumpster enclosure; the stored drums are proposed to be located within the dumpster enclosure until they are periodically removed from the property.

Applicant proposes to replace the existing 2,313 square foot building on the project property with a new building of the same square footage in the same location, that is, having the same setbacks and footprint as the existing building. Like the existing building, the proposed building will comply with the maximum building coverage requirements and the front and side minimum setback requirements of Table C-2. The proposed building will have the same noncomplying rear setback as the existing building; Applicants request a modification of the rear setback requirement for the new building under § 15.02(A)(3). The existing nonconforming canopy is not proposed to be changed.

Applicant's site plan proposes to replace some paved areas with landscaping to reduce the overall lot coverage of impervious area from 92% to 69.2%, bringing the lot into compliance with the maximum lot coverage of 70% required in Table C-2. The proposed site plan reduces the noncompliance of the front yard coverage from 90.5% to 69.8%, although it is still nonconforming with the front yard lot coverage requirement of 30%. § 3.06(H). Applicant also requests a modification of the front yard coverage requirements under § 15.02(A)(3).

The new building is proposed to house two uses: a convenience store (1,079 square feet) and a short-order restaurant (1,234 square feet). Both of these uses are allowed uses in the district: the short-order restaurant use is a permitted use, and the convenience store use is a conditional use. Applicant also proposes to retain the pre-existing non-conforming gasoline filling station use, without the servicing of vehicles, and to reduce the number of fueling positions on the property from eight to six, but to

4

leave the existing 1,647-square-foot canopy in place.  The reduction of fueling positions is proposed to be accomplished by removing the westerly portion of the northerly pump island, and using only a dispenser on the easterly portion of the northerly pump island, but this proposal does not appear to be reflected on the plans in evidence.  No exterior above-ground heating oil storage tank or any ground-mounted exterior heating or cooling equipment is now proposed.

The access curb cuts for the project site have been narrowed and angled to allow turns into and out of the project to and from eastbound Williston Road, and to prevent or discourage left turns into or out of the project across four lanes of traffic to and from Williston Road westbound.  The dual turn lane now in existence west of the Sheraton/Staples Plaza intersection is proposed to be converted to an eastbound left turn lane only, to accommodate left turns into the Sheraton entrance but to preclude any left turns from westbound Williston Road west of that intersection.  The raised median now in existence within Williston Road across from Appellant's property is not proposed to be extended towards the east.  Rather, the newly restricted eastbound left-turn-only lane will be striped at its westerly end to preclude westbound left turns and to direct eastbound traffic into the eastbound left-turn lane serving the Sheraton entrance.

Additional specific findings as to the project elements are incorporated in the remainder of the decision.


Applicant applied under § 15.02(C) to have the proposal reviewed as a Planned Unit Development (PUD). Section 15.02(C) allows "any applicant for site plan, conditional use and/or subdivision review, or any other application for land development requiring action by the [DRB]" to "request review pursuant to the PUD process and regulations."  The purpose of PUD review is "to provide relief from the strict dimensional standards for individual lots in these Regulations in order to

5

encourage innovation in design and layout, efficient use of land, and the viability of infill development and re-development in the City's Core Area . . . ." § 15.01. Specific PUD review criteria are found in § 15.18; proposed PUD projects must also obtain site plan approval. § 14.03(A)(6). Specific site plan review criteria are found in §§ 14.06 and 14.07. In addition, the requirements of § 13.01 relating to "Off-Street Parking and Loading" apply to the proposed project.

Consolidated Questions 3 and 4 – Setback and Coverage Modifications as a PUD

The proposed redevelopment of this small commercial lot is innovative in its layout, maximizing the efficient use of the existing small lot given its existing constraints,[4] and accomplishing viable infill redevelopment. Application for the redevelopment of this parcel as a PUD (containing mixed uses that are less nonconforming than the existing use) allows the DRB, and hence this Court, to consider "modification" of the front setback coverage requirement and the rear setback requirement. Sections 15.02(A)(3) and 2.02 (definition of "planned unit development") allow the modification of dimensional and coverage requirements. The proposed modifications, both of the rear setback requirement and of the front setback coverage requirement, do not exceed the limitations on such modifications set out in § 15.02(A)(3).

Applicant proposes to locate the new building in exactly the same footprint as the existing building. Moving the building too much farther forward on the property would intrude on the required front yard setback, without providing enough additional

---

[4] This proposal must be analyzed in the context that the property contains an existing nonconforming gasoline service and automobile service station use, with driveways onto Williston Road located much closer to the Staples Plaza intersection than would be acceptable for a new proposal, an existing canopy allowed to remain in place, and existing underground gasoline product tanks, all of which constrain the redevelopment of the site.

room at the rear of the property to move parking behind the building. Modification of the rear setback to the existing 5.9-foot setback is warranted given the preexisting gasoline service use within the front setback, and the location of the existing canopy overlapping the location of the existing building.

Section 3.06(H) requires that not more than 30% of the required front setback area be used for driveways and parking with the remainder to be landscaped and maintained in good appearance. The existing conditions on the site are that the front setback is largely used for a paved gasoline service area, so that the front setback coverage is 90.5%, without effective landscaping. The number of fueling positions within that area is being reduced from eight existing fueling positions to six, and the redesign of the paving and landscaping for the front setback area proposes to reduce the front setback coverage to 69.8%. This represents a substantial improvement in the front setback coverage, and warrants the requested modification of the front setback coverage requirement for the redevelopment of this existing site. Section 15.02(A)(3) allows this degree of coverage as it is a reduction in the noncompliance of the site with the applicable limit, compared to the existing condition.

Consolidated Question 6 – Grading and Erosion Controls

Section 15.18(A)(2) requires that sufficient grading and erosion controls be used, both during and after construction, "to prevent soil erosion and runoff from creating unhealthy or dangerous conditions" on the project property or on adjacent properties. The site is small and flat, so that the erosion control plans, including the use of silt fences and erosion control matting during construction, are sufficient to meet this criterion during construction.

Runoff from the roof of the building and the roof of the existing canopy is directed internally through piping to the sewer system. The grading plans for the finished site direct runoff towards catchbasins in both corners of the site near Williston

7

Road. Cuts in the interior curbing on the site in line with those catchbasins provide for that drainage. The design of the site will prevent runoff from creating unhealthy or dangerous conditions on the project property or on adjacent properties. The proposal meets § 15.18(A)(2).

Consolidated Question 11 – Fire Protection

Section 15.18(A)(7) requires the layout of the PUD to be reviewed by the Fire Chief, and sets out standards. The Fire Chief approved the project layout and plans as revised at trial. An existing fire hydrant located just westerly of the project property near Williston Road provides adequate fire protection for the site. Because the site is so small, and can be reached from Williston Road and from the Staples Plaza, fire equipment can reach all areas on the project property. In addition, the elimination of the vehicle service station function on the site improves its fire safety by eliminating the use of such flammable materials as are used in the service station functions. The proposal meets § 15.18(A)(7).

Consolidated Question 9 – Visual Compatibility with Planned Development Patterns

Section 15.18(A)(5) requires the proposal to be "visually compatible with the planned development patterns in the area, as specified in the Comprehensive Plan" and the purposes of the zoning district.

The area is close to the South Burlington western city boundary with the city of Burlington, and is generally the area surrounding the Interstate 89 interchange at Williston Road (Exit 14). As a Commercial-1 district, the planned development patterns for this area encourage the location of general retail and small office uses, and small industrial employers and clustered residential uses that do not interfere with the accessibility and continuity of the commercial district. Mixed use developments and

8

high-traffic-generating commercial uses are encouraged within PUDs in the district. Automobile sales and service is not an allowed use in the district.

The proposed project is visually compatible with Appellant's adjacent convenience store, and with the adjacent shopping center to the east, both of which are allowed development in this area under the Regulations and the Comprehensive Plan. Therefore, the proposal meets § 15.18(A)(5).

Consolidated Questions 16, 21 and 22 – Desirable Transition, Compatibility of Scale, and Harmonious Relationship

Sections 14.06(B)(1) (as to desirable transition from structure to site and structure to structure), 14.06(B)(3) and 14.06(C)(2) all address the visual compatibility or harmony of the proposed structures with their setting, including the height, scale and appearance of the structure within its site. The proposed flat-roofed building relates well in design to the overlapping existing flat canopy, and to the long low buildings in Staples Plaza. The proposed brick materials for the building relate harmoniously to Appellant's brick building, although the two buildings are screened from each other to some extent by trees and landscaping. The design and landscaping of the parking areas, and the curbing defining the parking areas, provides a transition from the structure to the site that was entirely lacking in the existing configuration of the site. The proposal therefore meets §§ 14.06(B)(1) (as to desirable transition), 14.06(B)(3) and 14.06(C)(2).

Consolidated Questions 10 and 12 – Open space and Infrastructure Relating to Adjacent Properties

Section 15.18(A)(6) requires that open space areas on the site be located "to maximize opportunities for creating contiguous open spaces between adjoining parcels." To the extent that this section is even applicable to this small a lot, the location of the lot adjacent to Williston Road requires most of the open space on the lot to be in

9

the front rather than along either side. The proposal meets § 15.18(A)(6) in that it lacks opportunities for contiguous open space.

Section 15.18(A)(8) requires that the project's sidewalks, lighting, utility lines, and landscaping, among other infrastructure elements, be "designed in a manner that is compatible with the extension of such services and infrastructure to adjacent properties." The existing paved opening in the guard rail between the project property and Staples Plaza is maintained in the project plans, which will allow access from the property to the Staples Plaza signalized intersection at some future time. Such access will provide a safer egress from the project property in both directions, whenever it becomes available.

The project's sidewalks along Williston Road connect with the sidewalk in front of Appellant's property to the west, and continue to the intersection of the Staples Plaza interior roadway with Williston Road to the east. The underground utilities and the project's lighting are designed compatibly with the extension of such municipal services to adjacent properties. The project's landscaping is designed compatibly with the existing landscaping or the extension of such landscaping to adjacent properties. Pedestrians traveling to and from the portion of the University of Vermont campus southerly of Williston Road to locations to the east of the project property currently cut through the project property and through Appellant's adjacent property. The design of the site at the westerly boundary of the project property does not impede this pedestrian traffic. In any event, the proposed project provides an appropriately-designed pedestrian sidewalk along Williston Road; the Regulations do not require Applicant to provide a more direct but less safe pedestrian access through the middle of the property. Therefore the proposal meets § 15.18(A)(8).

10

Consolidated Questions 13, 14, 15 – Conformity with Plan

The Comprehensive Plan (Plan) applicable to the present application is the one adopted in March of 2006. Even without analyzing whether any of the Plan provisions are enforceable or are unduly vague under the Vermont Supreme Court's analysis of this Plan in In re Appeal of JAM Golf, LLC, 2008 VT 110, ¶¶ 15–19, the proposed project is consistent with the Plan's stated land use policies, goals and objectives.

Section 15.18(A)(9) requires the project's roads, utilities, sidewalks and lighting to be designed to be consistent with the City's roadway and utility plans and maintenance standards. As seen on "Map 4 – Public Utilities #1" and "Public Utilities Map #2" in the appendices to the Plan, and Chapter 14 of the Plan, the City's intended roadway and sewer service already exist in this area and serve this property. Sidewalks and lighting also already exist to serve this property. Therefore the proposal meets § 15.18(A)(9).

Section 15.18(A)(10) requires the proposed project to be "consistent with the goals and objectives of the Comprehensive Plan for the affected district(s)." Section 14.06(A) states that the applicant should give "[d]ue attention" "to the goals and objectives and the stated land use policies for the City . . . as set forth in the Comprehensive Plan."

The proposed project is the redevelopment of a very small existing commercial site in the existing developed corridor of Williston Road. In this respect, the proposed project is consistent with the goals, objectives, and stated land use policies in Chapter 3 of the Plan regarding Land Use Distribution, at page 8, which "encourage continued investment and growth" in the existing developed corridor of Williston Road.

The proposed project adds a permitted use (short-order restaurant) to the site, maintains a conditional use (convenience store) on the site, eliminates the existing, nonconforming automobile service function from the site, and reduces the scope of the existing, nonconforming gasoline service use on the site. It improves the appearance of

11

the building on the site and the landscaping of the site. The proposed project is consistent with the goals, objectives, and stated land use policies in Chapter 5 of the Plan regarding Land Use, at pages 23, 26, 27, and 30, in that it redevelops and improves an existing commercial site in the Williston Road corridor intended by the Plan for such commercial uses, and thereby protects the residential neighborhoods from additional commercial encroachment, and improves the aesthetics, pedestrian amenities, and traffic conditions in the vicinity of the project. As a redevelopment and aesthetic improvement of an existing site, with shielded outdoor lighting, the proposed project is also consistent with the goals, objectives, and stated land use policies in Chapter 18 of the Plan regarding the City's Visual Design, at pages 165–66.

By placing all utilities underground, it is consistent with Recommended Action 17 in Chapter 9 of the Plan regarding Land Resources, at page 97. By providing for the sidewalk along Williston Road, it is consistent with the goals, objectives, and stated land use policies in Chapter 11 of the Plan regarding the provision of raised sidewalks adjacent to roadways as part of the City's pedestrian path system, at pages 107 and 114.

By preserving the potential for routing exiting traffic through the Staples Plaza signalized intersection, and by eliminating left turns into and out of the site, the proposal improves the traffic safety of the site in comparison with existing conditions, consistent with the goals, objectives, and stated land use policies in Chapter 12 of the Plan regarding Transportation, at pages 119 and 121 regarding access management.

Therefore the proposal meets §§ 15.18(A)(10) and 14.06(A).


Consolidated Question 16 – Adequate Planting

Section 14.06(B)(1) requires the site to be planned to "provide for adequate planting." Given the size and use of the site, the proposed landscaping presents a substantial improvement from the existing conditions, especially along the southerly boundary and westerly boundaries of the site adjacent to Appellant's property, as well

12

as the easterly boundary adjacent to the Staples Plaza entrance. All that is required is to reinforce the area in the northwesterly corner of the site that is shown within the curbing as a snow removal area, but which will be required to support the wheels of gasoline delivery trucks during maneuvers on the site. With such reinforcement, the proposal meets § 14.06(B)(1).

Consolidated Questions 16 (as to parking and safe pedestrian movement), 17 (as to parking), 18, 19 and 20 – Parking and On-Site Circulation

The project property is adjacent to a right-turn-only lane of Williston Road, that ends at the Staples Plaza intersection. The property now has two curb cuts on Williston Road that allow entrance to or exit from the property through either curb cut, so that conflicts can develop in on-site circulation between vehicles approaching the pumps having entered from both curb cuts. In addition, the transfer of vehicles into and out of the service bays in the existing building can conflict with vehicles approaching the fueling positions from both directions.

The curb cuts proposed for the project are narrower than the existing curb cuts and are designed at angles so as to allow only right turns into the property from the westerly curb cut, and to allow only right turns out of the property from the easterly curb cut. The redesigned curb cuts will therefore promote a generally counterclockwise or west-to-east circulation pattern for vehicles on site. The westerly half of the northerly pump island is proposed to be removed, leaving the two fueling positions on the easterly half of that pump island, and creating more room for on-site circulation of large vehicles. However, the site plans in evidence appear to leave the whole pump island in place, and will need to be revised to conform with the evidence on this point.

A gasoline delivery tractor-trailer will have just enough room, if the westerly portion of the site is not otherwise occupied by vehicles, to be able to enter the site from the westerly curb cut, pull forward to deliver its contents to an underground storage

tank, back up slowly towards the northwest corner of the site in a position for safely exiting the site, and to pull forward between the pump islands to exit the site via the easterly curb cut. The curbing affected by this movement pattern in the northwest corner of the site has been designed as mountable curbing to accommodate this movement, but the planted area behind the curbing must be reinforced to the extent necessary to keep the delivery vehicle's wheels from sinking into the earth under muddy conditions. The movement can be executed safely without affecting the sign or light pole in the corner of the site. This movement pattern obstructs several parking spaces, including the wheelchair-accessible space, requiring the scheduling of such deliveries only when the site can accommodate this movement pattern. Similarly, this delivery truck movement pattern can be executed safely and without intruding into the public sidewalk or onto Williston Road, but only during off-peak periods when the site is not congested.

Because Appellee-Applicant is in control of the scheduling of its gasoline delivery vehicles, and is in control of the safety training of its gasoline delivery vehicle drivers, a condition requiring deliveries only in off-peak hours will enable the proposal to meet the requirements of safe on-site circulation for gasoline delivery.

Nineteen parking spaces are provided on the site: six at the fueling positions and thirteen delineated by painted striping near the westerly, easterly, and southerly sides of the site. While § 14.06(B)(2) requires parking to be located to the rear or the sides of buildings "to the greatest extent practicable," on this small site and given the gasoline-dispensing use of the front of the site, it would not be practicable to move the building so as to place parking behind it.

The Regulations require 20 parking spaces for the uses on the site; Appellee-Applicant has applied for a waiver of one space. Nothing in the Regulations requires separate employee parking spaces to be provided, and nothing in the Regulations prohibits the parking spaces at the gasoline fueling stations from being counted as

14

spaces for the purposes of the regulations. The proposal warrants waiver of one parking space due to the three shared uses on site, as some users will be stopping at the site for more than one purpose.

A sidewalk is provided around the front and east side of the building, accommodating pedestrian access from the east or Staples Plaza area. A bicycle rack is also provided at the east side of the building for cyclist access. The safest route for pedestrian access to the building from the Williston Road sidewalk, however, will depend on the parking and usage pattern for vehicles at any given time. Because the site is small and visibility is not obstructed, pedestrians will be able to access the building from the sidewalk safely, even though a preferred pathway is not delineated on the pavement.

Therefore the proposal meets §§ 13.01(A), 13.01(B)(1), 13.01(N)(2), Table 13-2, 14.06(B)(1) (as to pedestrian movement and parking areas) and 14.06(B)(2).


Consolidated Question 15 – Site Plan Criteria

The only site plan criteria other than those already discussed with respect to Consolidated Questions 16, 20, 21, and 22 are §§ 14.06(B)(4) and 14.06(C)(1).

Section 14.06(B)(4) requires newly installed utility services and service modifications to be underground to the extent feasible. The electrical utility services for the existing site are above ground. All the utility services to serve the proposed project will be located underground, in compliance with this section.

As contrasted with § 14.06(C)(2) discussed above, which addresses the relationship of the proposal to other existing buildings and roads in the vicinity, § 14.06(C)(1) addresses the creation of "attractive transitions" between buildings of different architectural styles in the proposed project. The proposed project only involves one building, making this section inapplicable.

Therefore, the proposed project meets the site plan criteria in § 14.06.

<u>Consolidated Questions 7, 8, 17 (re traffic) – Traffic</u>

The project property is in a Traffic Overlay zoning district, §10.02, and must also meet §§ 15.18(A)(3) to prevent unreasonable congestion of adjacent roads. In addition, one of the purposes of the off-street parking and loading spaces required by § 13.01 is "to minimize traffic congestion . . . and the risk of motor vehicle and pedestrian accidents." § 13.01(A).

The proposed project will generate less traffic (fewer vehicle trip ends) than was generated by the existing uses on the property, and therefore meets the traffic generation requirements for the site. §10.02(H)(2).

The property now has two curb cuts on Williston Road that do not prohibit left turns to be made into or out of the property. Left turns from the property must now cross four lanes of eastbound or turning traffic to reach the first westbound lane, a highly dangerous turning movement at this location. Left turns to the property are also dangerous, crossing three traveled lanes of traffic, but under current conditions they are allowed to be made, from a dual direction turn lane located just westerly of the Sheraton signalized intersection.

Despite the fact that the proposed project property is located very close to a signalized intersection at the entrance to Staples Plaza, several proposed improvements will produce a net benefit for traffic flow.

The curb cuts for the proposed project are narrower and are designed at angles so as to allow only right turns into the property from the westerly curb cut, and to allow only right turns out of the property from the easterly curb cut, which will discourage the dangerous cross-lane left turn turning movements, and promote more rational on-site circulation. The redesigned curb cuts, however, require signage advising drivers of the restrictions in the event that the geometry of the curb cuts is not enough to suggest their function, and if the directional arrows to be painted on the pavement are obscured

16

by snow. The following signs, visible to a driver seeking to exit the property, are necessary so that the redesigned curb cuts work as designed: at the easterly curb cut, a sign or signs clearly indicating "no left turn" and/or "right turn only;" and, at the westerly curb cut, a sign or signs clearly indicating "not an exit."

The conversion of the existing dual turn lane to an eastbound left turn lane only, will allow eastbound left turns into the Sheraton entrance. Left turns into the site from westbound Williston Road west of that intersection will no longer be legal, and should be effectively prevented by the combination of the turn lane conversion and the angled geometry of the project site's curb cuts.

Appellant questions whether the proposed striping, double yellow line, and elimination of the left turn option for westbound traffic will be enough in fact to eliminate dangerous westbound left-hand turns across three lanes of traffic into the site, and suggests that the raised median now in place in front of its property be extended towards the east in front of the project property. However, a countervailing consideration is the need to preserve a sufficient length and width in the eastbound left turn lane allowing turns into the Sheraton driveway. If the proposed changes to the turn lane and pavement markings are not effective to eliminate the dangerous left turn into or out of the project site, further traffic control measures may be considered by the DRB, including the extension of the raised median.

Although the site is small and described as "tight," and the adjacent roadway is among the most congested in the City in the afternoon peak hour, the access and circulation proposed for the site will make the use of the site less chaotic and will not create or add to the unreasonable congestion of the adjacent roadway. During congested or high use periods, the site is sufficiently visible from the adjacent roadway so that drivers who observe congestion on the site are likely to choose not to enter the site at that time.

The proposal meets the requirements of §§ 10.02, 13.01(A), and 15.18(A)(3) as to traffic.

Consolidated Question 5 – PUD Criteria

The only PUD criteria other than those already discussed with respect to Consolidated Questions 6, 7, 9, 10, 11, 12, 13, and 14 are §§ 15.18(A)(1) and 15.18(A)(4).

The existing as well as the proposed project is supplied by municipal water and served by the municipal sewer system. The existing water demand of the project is 1280 gallons per day, and the existing sewer flow is 1080 gallons per day. The proposed water demand for the project is calculated to be 1215 gallons per day, with the proposed sewer flow calculated to be 972 gallons per day. As the proposed project represents a reduced volume demand for water supply and wastewater disposal, it meets the requirement of § 15.18(A)(1) that there be sufficient water supply and wastewater disposal capacity to meet the needs of the project in conformance with applicable City and state requirements.

Section 15.18(A)(4) requires that the project's design respects and provides suitable protection to "wetlands, streams, wildlife habitat . . . and any unique natural features" on the site. The evidence showed none of the listed features on the site, making § 15.18(A)(4) inapplicable to this analysis.

The proposed redevelopment of this small commercial lot is innovative in its layout, maximizing the efficient use of the existing small lot given its existing constraints, and accomplishing viable infill redevelopment. It meets all of the PUD criteria in §§15.18(A)(1)–(10).

Consolidated Question 24 – Encroachment on Appellant's Property

The proposed project is located wholly on Applicant's property and can be constructed and operated wholly on Applicant's property without encroaching on

Appellant's property. Nothing in this approval allows construction of fixtures or storage or anything else on Appellant's property, or allows entry onto that property during or for the purposes of construction, or allows any other activity beyond the property boundary, whether or not any such activity has occurred in the past.

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED that the project as proposed is APPROVED. In addition to any conditions imposed in the DRB's decision, the Court hereby imposes the following additional conditions:

1. Applicant shall provide revised site plans for filing in the City's files for this project, to reflect the actual proposed removal of the westerly half of the northerly pump island (as shown on the truck turning plans presented in evidence, rather than as shown on the site plans in evidence); to reflect the signage required in Paragraph 2 below; and to reflect the reinforcement required in Paragraph 3 below.

2. In addition to the proposed pavement markings, Applicant shall provide the following signs visible to a driver seeking to exit the property: at the easterly curb cut, a sign or signs clearly indicating "no left turn" and/or "right turn only;" and at the westerly curb cut, a sign or signs clearly indicating "not an exit."

3. Applicant shall reinforce the portion of the planting area in the northwest corner of the site, behind the mountable curb, with planting bricks or other methods, to the extent necessary to accommodate the wheels of the delivery vehicle backing onto the mountable curb. Applicant shall schedule gasoline deliveries to occur only at off-peak hours, when the necessary on-site maneuvers of the delivery vehicle can occur safely, and shall train its drivers in the safe execution of those maneuvers. Applicant

19

shall remove snow from the westerly corner area prior to deliveries, sufficiently to allow the on-site delivery vehicle maneuver to be made safely.

4. If the pavement striping in Williston Road, together with the on-site signage, is not effective to prevent left turns from the property onto Williston Road westbound, and from westbound Williston Road onto the property, further traffic control measures may be considered by the DRB, including the extension of the raised median.

Done at Berlin, Vermont, this 12th day of June, 2009.


_____
        Merideth Wright
        Environmental Judge